COURT OF APPEALS
DECISION
DATED AND FILED

March 1, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. **2021AP159-CR**
**2021AP160-CR**
STATE OF WISCONSIN

Cir. Ct. Nos. **2017CF3993**
**2018CF4825**

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

NICHOLAS SANTANA,

DEFENDANT-APPELLANT.

APPEAL from judgments and an order of the circuit court for Milwaukee County: DAVID A. FEISS and JEFFREY A. WAGNER, Judges. *Affirmed*.

Before Brash, C.J., Donald, P.J., and White, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Nicholas Santana appeals his judgments of conviction entered upon a jury's verdict in a joined trial for first-degree recklessly endangering safety with use of a dangerous weapon, and substantial battery with intent to cause bodily harm, both counts with domestic abuse assessments, and felony intimidation of a witness by a person charged with a felony. He also appeals the circuit court order denying his motion for postconviction relief without a hearing. He argues that newly discovered evidence, a *Brady*[1] violation, and ineffective assistance of counsel compel a new trial or evidentiary hearing. Upon review, we reject his claims and affirm.

## BACKGROUND

¶2    This matter arises out of an altercation between Santana and his live-in girlfriend, M.B., in August 2017. According to the criminal complaint, Milwaukee police responded to a 911 call and spoke with M.B., who reported that Santana physically attacked her after an argument and she sought help for her injuries shortly after the attack. M.B. told police that Santana choked her, punched her in the face twice, stabbed her in the face, and then kicked her in the stomach and back. M.B. was treated at St. Luke's Hospital; the complaint stated that the emergency room doctor diagnosed M.B with a nasal fracture and she received sixteen stitches for the stab wound. Santana was charged with three counts: (1) first-degree recklessly endangering safety, with use of a dangerous weapon with a domestic abuse assessment; (2) substantial battery with intent to

---

[1]  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

cause bodily harm with a domestic abuse assessment; and (3) strangulation and suffocation.[2]

¶3      The trial court[3] granted the State's motion to join for trial a second complaint against Santana, and the trial was conducted in November 2018.  We recite relevant testimony from the trial.  M.B. testified that on the date of the incident, she and Santana were visiting with Ralph Schmall, a friend of Santana's, and hanging out in Schmall's backyard when she and Santana got into a "belligerent" argument "calling each other names."  M.B. said she was going to leave, but when she tried to pick up her bag, Santana "grabbed [her] in a choke[]hold."  M.B. testified that Santana put his forearm around her neck from behind.  Santana punched her twice in the face.  Then he started kicking her in her "hands and … body and [her] neck and [her] back."  She testified that Santana stopped when Schmall, who had gone inside his residence, came back outside.  She got up and realized she was bleeding from her face; she had a cut "all the way from [her] eye, all the way down [her] cheek" on the right side of her face.  She testified she went to a nearby Popeye's restaurant and they called an ambulance to take her to St. Luke's Hospital.  She testified that although she did not see Santana

---

[2]  Santana was ordered to have no-contact with M.B. as a condition of his bond, an order issued the same day as the criminal complaint.  The State issued a second complaint against Santana in October 2018 alleging a single count of felony intimidation of a witness by a person charged with a felony.  The second complaint alleged that while in custody at the House of Corrections, Santana violated the no-contact order and called M.B.  The police listened to a call from July 19, 2018, in which Santana told M.B. he was taking the case to trial and that she should "stay out of the way."  We do not further discuss the witness intimidation charge because those underlying facts are not at issue in Santana's postconviction motion or appeal.

[3] The Honorable Cynthia Mae Davis presided over Santana's jury trial.  We refer to Judge Davis as the trial court.

stab her with his pocketknife, she believed that the injury to her face was from a knife and she knew Santana carried his pocketknife around most of the time.

¶4     Schmall testified that after visiting with Santana and M.B., he found M.B. on the ground in the yard.  He stated that M.B. was bleeding and she told him that Santana hit her and stabbed her.  After M.B. left, Schmall went into the yard to clean up and saw Santana, who showed his pocketknife to Schmall.

¶5     Officer Taylor Baas testified that he responded to a 911 call at Popeye's restaurant, where he met with M.B. and then took her statement at St. Luke's Hospital.  Officer Luis Vargas Ramos testified that he was dispatched to the scene of the incident and found Santana, based on the description of the suspect.  He detained Santana and found the pocketknife in his pocket during the search incident to his arrest.  Officer David Cabral testified that he and his partner, Officer Baas, responded to the 911 call at Popeye's restaurant.  He testified that M.B had a deep wound to her face.

¶6     Dr. Charles Nussbaum testified that he was the emergency room physician who treated M.B.'s injuries at St. Luke's Hospital.  He testified that this case stood out as "one of the more significant or concerning assault type of cases that I've seen."  He testified that M.B. told him that Santana caused her injuries. He testified that for the laceration to the face, a physician's assistant who worked with him closed the injury with sutures; he explained that "[i]t actually had to be done in two layers; some deep sutures to pull—to fasten the muscle tissue together, and then some sutures to close the skin over the top."  He testified it took sixteen sutures to close the laceration and the wound was two and one-half inches long.  He testified that the laceration was deep, going through the skin and muscle,

exposing the bone. Further, he testified that M.B. sustained fractures to her orbital socket and nasal bone.

¶7 The jury returned guilty verdicts for first-degree recklessly endangering safety with use of a dangerous weapon and substantial battery with intent to cause bodily harm, but Santana was acquitted of the strangulation and suffocation charge. The jury returned a guilty verdict on the count of felony intimidation of a witness from the second case.

¶8 Prior to sentencing, Santana's trial counsel informed the trial court that he was pursing potential newly discovered evidence. Santana was told by Justin D. Jackson, another inmate at the jail, that M.B. had been involved in an allegedly similar stabbing incident. The State investigated and turned over two reports, one from 2009, the other from 2013, both involving M.B.[4] The State summarized the reports:

> [I]t is an alleged stabbing by her sister; and at one point during the initial police investigation she indicates that via nodding, that she did this to herself; but that is in the context of a long investigation where she is relatively consistent throughout that her sister did this to her and the same sister has been referred in on at least two other occasions for stabbing other people.

---

[4] These police reports were not included in the record on appeal and we base our review on the characterizations in the record. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("An appellate court's review is confined to those parts of the record made available to it.").

In May 2019, the sentencing court[5] imposed a global sentence for all three counts of nine years and six-months, divided as four years and six-months of initial confinement and five years of extended supervision.

¶9     In August 2020, Santana moved for postconviction relief on the basis of newly discovered evidence from Jackson that M.B. had been previously involved in a similar stabbing incident;[6] a ***Brady*** material violation because the State did not produce police statements from the other stabbing case; and ineffective assistance of counsel for failing to investigate M.B. and her prior false allegation and for failing to impeach M.B. about her statement to the District Attorney's office's victim-witness advocate denying that Santana had attacked her. In January 2021, the circuit court[7] denied Santana's motion without a hearing.

¶10     Santana appeals. Additional facts are included in the discussion.

## DISCUSSION

¶11     Santana brings on appeal the same claims he made to the circuit court: newly discovered evidence, a ***Brady*** violation, and ineffective assistance of counsel. He again seeks an evidentiary hearing or a new trial on his claims. A defendant is not automatically entitled to an evidentiary hearing on his or her postconviction motion. ***State v. Bentley***, 201 Wis. 2d 303, 310, 548 N.W.2d 50

---

[5] The Honorable David Feiss presided over Santana's sentencing. We refer to Judge Feiss as the sentencing court.

[6] Santana's postconviction motion included a signed and dated letter from Jackson from May 2019.

[7] The Honorable Jeffrey A. Wagner denied Santana's motion for postconviction relief. We refer to Judge Wagner as the circuit court.

(1996). The postconviction court must hold an evidentiary hearing only if the defendant alleges "sufficient material facts that, if true, would entitle the defendant to relief," which is a question of law that we review independently. ***State v. Allen***, 2004 WI 106, ¶¶9, 14, 274 Wis. 2d 568, 682 N.W.2d 433. In order for a defendant to be entitled to a hearing, the motion must "allege the five 'w's' and one 'h'; that is, who, what, where, when, why, and how" of the defendant's claims. ***Id.***, ¶23. If the motion does not set forth sufficient facts, presents only conclusory allegations, or the record establishes conclusively that the defendant is not entitled to relief, the circuit court may grant or deny a hearing at its discretion. ***Id.***, ¶9.

### I. Newly discovered evidence

¶12 Santana argues that Jackson's letter is newly discovered evidence warranting a new trial. Jackson's letter stated that he met Santana while they were both in jail but he "did not know him outside of jail at all." Jackson recognized M.B.'s name and said that he "kn[e]w her from the neighborhood." Jackson stated that, "On one occasion, I talked to her about an incident between her and her sister. She told me she stabbed herself and called 911 on her sister because her sister would not give her money for drugs."

¶13 "In order to set aside a judgment of conviction based on newly[]discovered evidence, the newly[]discovered evidence must be sufficient to establish that a defendant's conviction was a 'manifest injustice.'" ***State v. Plude***, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (citations omitted). Mirroring the statutory requirements warranting a new trial on the basis of newly discovered

evidence in WIS. STAT. § 805.15(3) (2019-20),[8] a postconviction motion must establish by clear and convincing evidence that: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Love*, 2005 WI 116, ¶43, 284 Wis. 2d 111, 700 N.W.2d 62 (citation omitted). We review the circuit court's decision to grant or deny a motion for a new trial based on newly discovered evidence under the erroneous exercise of discretion standard. *See Plude*, 310 Wis. 2d 28, ¶31.

¶14 If the defendant establishes the four factors of newly discovered evidence, then the circuit court must determine whether there is a reasonable probability that a different result would have been reached at trial if the newly discovered evidence had been presented. *See Love*, 284 Wis. 2d 111, ¶44. "A reasonable probability of a different outcome exists if there is a reasonable probability that a jury, looking at both the old evidence and the new evidence, would have a reasonable doubt as to the defendant's guilt." *State v. Vollbrecht*, 2012 WI App 90, ¶18, 344 Wis. 2d 69, 820 N.W.2d 443. The determination of a reasonable probability is a question of law. *Id.*

¶15 Santana argues that Jackson's letter satisfies the newly discovered evidence standard because it: (1) came to light after his trial; (2) he was not negligent in seeking out the information; (3) it was material because it impugned M.B.'s credibility as a witness; and (4) it was not cumulative because the jury did not hear about M.B. making false allegations in the past. Finally, he argues that

---

[8] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

there was a reasonable probability that this evidence would result in a different outcome because it would paint a different picture of M.B. He claims that at trial, "M.B. was presented as a clean, law abiding citizen who was randomly attacked by Santana." He asserts that M.B. was presented at trial as "a person incapable of giving false information."

¶16 Santana contends that the allegations in Jackson's letter would impeach M.B.'s credibility such that there was a reasonable probability of a different outcome if this evidence had been presented. The record, however, does not support Santana's characterization that there had been no impeachment of M.B. Trial counsel's cross-examination was thorough. The record reflects that trial counsel repeatedly questioned M.B.'s recollection of Santana's assault and her credibility through cross-examination and through questioning other witnesses.

- M.B. testified during direct examination that Santana put her in a chokehold from behind. During cross-examination, trial counsel, relying on M.B.'s initial statements to the police, asked M.B. if she told the police that Santana "grabbed you by the neck with an unknown hand and applied pressure?" She testified she was not sure. Officer Baas testified that M.B. told him at the hospital that Santana approached her and grabbed the front of her throat with his right hand.

- M.B. testified that when she broke out of the chokehold, she tried to hold back Santana by his forearms. During cross-examination, M.B. testified that she recalled grappling with Santana, but she was not sure what Santana's hands were doing at that point. However, Officer Baas testified that M.B. did not talk about grappling with

9

Santana while standing after the chokehold in his interview with her. He testified that M.B. told him that she was on the ground on her back and Santana straddled her.

- Although M.B. repeatedly testified that she never saw a knife in Santana's hands, she did suggest she saw him reach into his pants pockets, but it was dark and she was not sure. Officer Baas testified that M.B. did not tell him that she saw Santana try to reach into his pocket. After the State played Officer Cabral's body camera video footage, Officer Cabral testified that he heard M.B. state that "He smashed me in the face with a black object, which was a knife."

- M.B. testified that Santana only stopped when Schmall came outside. Officer Baas testified that M.B. told him that the altercation ended when Schmall came outside and stopped them. However, Schmall testified that he did not see the altercation and did not pull Santana off of M.B.

- M.B. testified that the origin of the fight was that Santana accused her of promiscuous behavior. However, Officer Baas testified that M.B. told him they argued abut Santana's drinking.

- Trial counsel asked if M.B. remembered calling the victim-witness advocate at the Milwaukee County District Attorney's office in September 2017 and leaving a message saying, "he never did that; I have no recollection of strangulation happening; I was intoxicated and it was a blur; I have a scar, but I don't know how it happened." M.B. testified that she did not remember making that call.

10

¶17    Santana asserts that evidence that M.B. previously made up a story about being stabbed would impeach her credibility with the jury. However, impeaching her credibility in this way would not undermine the additional credible evidence of Santana's guilt. The State presented ample evidence against Santana. The testimony of Dr. Nussbaum laid out the seriousness of M.B.'s injuries. He stated that this case stood out as "one of the more significant or concerning assault type of cases that I've seen." He testified in detail about the extent of M.B.'s injuries including a fracture to the orbital socket, broken nose, and the deep wound near the eye. He explained that the injury exposed the bone and required two layers of sutures—the facial muscle and also the skin. He testified that the wound was "less than a centimeter" away from her eye. He discussed her medical records relating to the incident.

¶18    Further, the medical evidence concurred with the other trial testimony. M.B. testified not only about her injuries but about how Santana attacked her—punching, kicking, and stabbing her. Officer Baas, Officer Cabral, and Schmall each testified about seeing M.B.'s bleeding facial wound and Schmall testified he found her on the ground in the yard. Here, we echo the circuit court in its decision denying postconviction relief: "The notion that the victim fractured her own nose, fractured her own orbital bone, and cut her own face so deeply that it severed the muscle tissue is *utterly absurd*."

¶19    We conclude that there was no reasonable probability of a different outcome if the allegations in Jackson's letter had been brought before the jury. Even if the jury heard about the allegation that M.B. had lied about being the victim in an unrelated stabbing incident, we remain confident in the jury's verdict in light of the overwhelming evidence. Therefore, we conclude that Santana has failed to satisfy the newly discovered evidence standard and we reject this claim.

¶20 Santana has failed to present sufficient material facts to be entitled to an evidentiary hearing on his claim of newly discovered evidence. *See Allen*, 274 Wis. 2d 568, ¶9. He offers conclusory allegations that Jackson's letter and the allegation that M.B. previously lied in an unrelated stabbing case would challenge M.B.'s credibility without explaining how such a challenge could undermine the physical and medical evidence of M.B.'s injuries. Further, Santana does not offer the specific "who, what, where, when and how" of the prior incident to allow the court a meaningful opportunity to evaluate Santana's claim that the current incident was also staged. Jackson's letter presents a cursory allegation that M.B. falsely claimed that she was stabbed by her sister. *Id.*, ¶23. Although Santana has characterized the incidents as identical, Santana does not set forth who was involved in the stabbing incident, when and where it happened, how the previous incident occurred, what the outcome of the previous case was, what injuries were sustained and whether the falsehood was proven or admitted. As the circuit court stated, it is "*utterly absurd*" for Santana to claim that M.B. fractured her own orbital socket, broke her own nose, and cut her own face with sufficient force so as to require suturing in the muscle layer. Santana's arguments are undeveloped and conclusory. Accordingly, we conclude that the trial court did not err when it denied Santana's postconviction motion without an evidentiary hearing.

## II. *Brady* violation

¶21 Santana argues that the State violated its obligations under *Brady* to provide exculpatory evidence, specifically the police reports and statements involving M.B.'s allegations and recantation of her allegation against her sister. Santana argues that the State knew or should have known about the prior allegedly false allegations by M.B., in essence the information in Jackson's letter, and thus disclosed the information.

¶22    "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence that impeaches or affects the credibility of a witness also "falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972). The three prerequisites for a *Brady* violation are: (1) the evidence must be favorable either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State; and (3) the defendant must have suffered prejudice. *State v. Harris*, 2004 WI 64, ¶15, 272 Wis. 2d 80, 680 N.W.2d 737. This court "independently review[s] whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous." *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶23    Santana argues that the State violated its obligations under *Brady* to provide exculpatory evidence as it related to M.B.'s false allegations against her sister. Santana argues that these statements would reflect upon M.B.'s credibility, which Santana contends was portrayed as "impeccable" at trial. The State argues it did not commit a *Brady* violation because the evidence of false allegations was not material or exculpatory. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). As discussed above, the record reflects that M.B.'s credibility was thoroughly tested at trial; therefore, having additional impeachment testimony is not material such that it would considered favorable evidence under *Brady*. Even if the jury heard Jackson's statement that M.B. had previously

allegedly lied about an unrelated stabbing incident, we remain confident in the jury's verdict in light of the overwhelming evidence that included testimony from three police officers, the emergency room doctor, and a third-party witness as well as M.B. herself. Accordingly, we conclude that the State has not violated its obligations under *Brady* and Santana's claim fails.

¶24 For the reasons discussed here and under the newly discovered evidence section, we conclude that Santana has only made conclusory allegations and has not alleged sufficient material facts to be entitled to an evidentiary hearing on his claims. *See Allen*, 274 Wis. 2d 568, ¶9. Accordingly the circuit court did not err when it denied his postconviction motion without a hearing.

### III. Ineffective assistance of counsel

¶25 Santana argues that trial counsel provided ineffective assistance of counsel in two ways: (1) failing to investigate and discover M.B.'s false claim that she had been stabbed by her sister; and (2) failing to impeach M.B. with her recorded statement to the victim-witness advocate at the District Attorney's office in which she denied that Santana was guilty.

¶26 To prove ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the defendant was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). For the first prong, "[c]ounsel's conduct is constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305. For the second prong, the defendant must show prejudice by counsel's performance. *Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In our analysis, we "may reverse the order of the two tests or avoid the deficient performance analysis altogether if the defendant has failed to show prejudice" from counsel's performance. *See State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶27 We begin with Santana's first claim, which relies on the same evidence raised as newly discovered evidence and as a *Brady* violation. Santana argues that trial counsel provided ineffective assistance because counsel failed to investigate M.B. to find previous false allegations of being the victim of a stabbing. The State, however, argues that Santana fails to explain how trial counsel could have discovered this information, which the State did not find until after Santana shared Jackson's allegation. We focus on the prejudice prong of the ineffectiveness test. Even if we assume without deciding that trial counsel's performance was deficient for failing to investigate M.B., we discern no prejudice. Again, Santana argues that this evidence would impeach M.B. as a witness. However, the record reflects that trial counsel impeached M.B.'s testimony in a myriad of ways from her recollection of the event to her statements to the police. Santana offers no reason to believe that an unrelated incident would overcome the overwhelming evidence of Santana's guilt. We may "avoid the deficient performance analysis altogether if the defendant has failed to show prejudice" from counsel's performance. *See Johnson*, 153 Wis. 2d at 128. Accordingly, we conclude Santana has failed to show ineffective assistance of counsel for this claim.

¶28 We next consider Santana's second claim of ineffective assistance of counsel, in which he argues that trial counsel failed to impeach M.B. with her recorded call to the victim-witness advocate in which she denied that Santana

15

assaulted her. Santana contends that the call amounted to a recantation and that trial counsel failed to provide sufficient focus on the statement. Santana argues that trial counsel could have called the victim-witness advocate who received the call as a witness, presented M.B. with the statement to refresh her recollection, or impeached her with her prior inconsistent statement. Santana asserts it was deficient to fail to do anything but accept M.B.'s statement that she did not remember leaving the message and moving on. The State argues that it was reasonable for counsel not to ask more questions because M.B. could have continued denying any memory of it, which would not have aided Santana's defense.

¶29 We conclude that Santana's argument that trial counsel should have done more with this phone call amounts to little more than a hindsight analysis. *See Thiel*, 264 Wis. 2d 571, ¶19 ("When evaluating counsel's performance, courts are to be 'highly deferential' and must avoid the 'distorting effects of hindsight.'" (citation omitted)). The record reflects that trial counsel asked M.B. about the call to the victim-witness advocate, reading the denial in its entirety. There is no reason to believe that any additional questions about the statement would have provided the jury with information it did not already have. Santana fails to show that trial counsel's performance fell below an "objective standard of reasonableness" by not further pursuing the victim-witness statement. *Id.*

¶30 Further, Santana fails to show the prejudice he suffered from trial counsel's failure to pursue M.B.'s denial of knowledge of the recording of her recantation. There is no reasonable probability of a different outcome at trial if counsel had made the recantation a focus of the defense in light of the overwhelming evidence against Santana presented by the State. Because a

16

defendant must satisfy both prongs to show ineffective assistance of counsel and Santana has shown neither on this claim, we conclude that Santana's claim fails.

¶31 For the reasons discussed here and in the discussion of newly discovered evidence and the ***Brady*** violation, we conclude that Santana's allegations are conclusory and he has not alleged sufficient material facts to be entitled to an evidentiary hearing on his claims. *See **Allen***, 274 Wis. 2d 568, ¶9. Accordingly the circuit court did not err when it denied his postconviction motion without a hearing.

**CONCLUSION**

¶32 We conclude that Santana's claims for postconviction relief fail. First, Jackson's letter fails to satisfy the standard for newly discovered evidence because further impeachment evidence would not have a reasonable probability of a different outcome. Second, the State did not violate its ***Brady*** obligations because Santana fails to show that allegations of M.B.'s previous false statement in an unrelated case is material to the instant case, which means here that the evidence had a reasonable probability of undermining the verdict. Additional impeachment evidence is not material in light of the overwhelming evidence against Santana. Third, Santana fails to prove ineffective assistance of counsel because ultimately, he cannot show that trial counsel's performance was deficient or that counsel's performance prejudiced his defense by not pursuing additional impeachment evidence against M.B. in the previous stabbing case or about her call denying Santana's responsibility for the incident to the victim-witness advocate. Because Santana does not allege sufficient material facts to support his claims and the allegations he makes are conclusory, we conclude that the circuit court did not err when it denied his postconviction motion without a hearing.

17

*By the Court.*—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.